UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
FELICIA M. TAYLOR,
                    Plaintiff,

                                          10-CV-6166T

v.                                        **DECISION**
                                          **And ORDER**
MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

_____

## INTRODUCTION

Plaintiff, Felicia M. Taylor("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Plaintiff applied for DIB and Supplemental Security Income (SSI) benefits under Title II and Tile XVI of the Social Security Act ("the Act") for a period of disability and disability insurance benefits, alleging disability beginning September 30, 2006. Plaintiff moves for judgment on the pleadings alleging that the decision of the Administrative Law Judge, John P. Costello ("ALJ"), that the Plaintiff was not disabled within the meaning of Act, was not supported by substantial evidence in the record and was contrary to applicable law. The Plaintiff asserts that, for the aforementioned reasons, the ALJ's decisions should be reversed.

The Commissioner moves for judgment on the pleadings claiming that the decision of the ALJ is supported by substantial evidence

1

in the record and should be affirmed. After reviewing the entire record, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record. Therefore, for the reasons set forth below, the Commissioner's motion for judgement on the pleadings is granted, and the Plaintiff's motion is denied.

## BACKGROUND

On November 20, 2007, Plaintiff applied for DIB and SSI benefits alleging disability due to a seizure disorder, asthma, a lumbar spine disorder, and depression. Plaintiff was born May 15, 1977. Plaintiff completed one year of college and previously worked as a mail clerk.

Plaintiff's applications for DIB and SSI benefits were denied. Plaintiff timely filed a request for a hearing before an ALJ, and she appeared, with counsel, before ALJ John P. Costello on August 7, 2008. In a decision dated June 29, 2009, the ALJ found that Plaintiff was not disabled within the meaning of the Act. This decision became final when the Appeals Council denied review on February 2, 2010. Plaintiff then filed this action seeking review of the Commissioner's decision with respect to her DIB claim. Plaintiff did not timely seek review of her SSI claim. The issue is whether the claimant is disabled under § 216 (I) and § 223(d) of the Act.

## DISCUSSION

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Matthews v. Eldridge, 424 U.S. 319, 320 (1976). When considering such a claim, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the court's scope of review to determining whether or not the Commissioner's findings are supported by substantial evidence. See Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that the reviewing court does not try a benefits case de novo).

While the court must act as "more than an uncritical rubber stamp," it must not "decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the [Commissioner]." Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986); Sitarek v. Shalala, 92-CV-641S, 1994 U.S. Dist. LEXIS 5851 (W.D.N.Y. April 21, 1994). The Commissioner's findings are not subject to reversal merely because two inconsistent conclusions could be drawn from the evidence, so long as his particular finding is supported by substantial evidence. See, e.g., NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299-300 (1939); Walker v. Bowen, 834

3

F.2d 635, 640 (7th Cir. 1987)("where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary").

The court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." <u>Lynn v. Schweiker</u>, 565 F. Supp. 265, 267 (S.D. Tex.1983) (citation omitted). The Commissioner contends that his decision was reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after a review of the pleadings, the court is convinced that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief, judgment on the pleadings may be appropriate. <u>See</u>, <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). An individual will only be considered "under a

disability" if his impairment is so severe that he is both unable to do his previous work and unable to engage in any other kind of substantial gainful work that exists in the national economy. §§ 423(d)(2)(A).

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Transcript 10-16) (hereinafter "Tr."). The five-step analysis requires the ALJ to consider the following:

    (1)   Whether the claimant is currently engaged in substantial gainful activity;

    (2)   if not, whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities;

    (3)   if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

    (4)   if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

    (5)   if the claimant's impairments prevent her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity ("RFC") and vocational factors, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v). Here, the ALJ found that (1) the Plaintiff has not engaged in substantial gainful activity since September 30, 2006, the alleged onset date; (2) the Plaintiff has the following severe impairments: seizure disorder, lumbar spine disorder, and depression; (3) these impairments either singularly or combined do not meet or medically

equal one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1; and (4) the Plaintiff can perform her past relevant work as a mail clerk. Because there were questions regarding whether Plaintiff worked as a mail clerk at the substantial gainful activity level, the ALJ proceeded to step five. A vocational expert ("VE") testified that based on Plaintiff's past work history and her alleged impairments, she was able to perform other work existing in the national economy. The ALJ thus determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) with the following limitations: Plaintiff must avoid operating motor vehicles, working with heavy machinery, and working at unprotected heights; Plaintiff is able to understand, remember and follow only simple instructions; and Plaintiff is only able to occasionally interact with co-workers and the general public.

A.   <u>Medical and Testimonial Evidence.</u>

The Plaintiff was admitted to Rochester General Hospital ("Rochester General") on February 23, 2002, with multiple gunshot wounds to the face, right hip and leg, following an incident in which her fiancé was killed. (Tr. at 168-188, 10). She subsequently received follow-up care at Culver Medical Group ("Culver Medical"), her primary care provider.

On October 13, 2006, Plaintiff presented to Rochester General with complaints of a seizure. (Tr. at 197-98). Physical examination

of Plaintiff was unremarkable. Her neurological examination, except for lethargy, was normal; a computed tomography ("CT") scan of the brain was normal; and an electroencephalogram ("EEG"), performed on October 16, 2006, did not indicate any epileptiform foci. (Tr. at 197-98). Plaintiff's toxicology was positive for marijuana. (Tr. at 198). She was prescribed Dilantin and instructed to follow-up with her primary care physician at Culver Medical. Id.

Plaintiff followed-up with Culver Medical on October 18, 2006. (Tr. at 302). Culver Medical lowered Plaintiff's dose of Dilantin because of toxicity concerns. Culver Medical noted that Plaintiff was laid off from work. Id. By October 30, 2006, Plaintiff's symptoms of Dilantin toxicity were resolved. (Tr. at 300).

On March 29, 2007, Plaintiff had a magnetic resonance imaging ("MRI") and a magnetic resonance angiogram ("MRA") of the brain at Strong Memorial Hospital ("Strong Memorial"). (Tr. at 298-99). Although the MRI was not fully completed, both tests indicated: symmetrical bilateral hippocampi, and normal anatomy and configuration; bilateral temporal horns symmetrically prominent to the rest of the ventricular system but no hydrocephalus nor midline shift; no acute bleeding; no fluid collection; no focal significant intracranial abnormality; and no abnormality of the MRA. (Tr. at 298-99). Rochester General again admitted Plaintiff for complaints of seizure on June 30, 2007. (Tr. at 249). A CT scan of the brain indicated no changes from the prior CT scan of October 13, 2006.

Laboratory results indicated low Dilantin levels and abnormal levels of cannabinoids. (Tr. at 241, 246). Rochester General determined that the seizure was because of low Dilantin levels and ordered Plaintiff to resume her original Dilantin dose. (Tr. at 252).

On July 6, 2007, Plaintiff followed-up with Culver Medical after her discharge from Rochester General. (Tr. at 269). Plaintiff reported that she was feeling better. Id. Dr. Karen Nead diagnosed epilepsy. Id. Plaintiff did not report any new seizures during her July 25, 2007 follow-up with Dr. Nead. (Tr. at 281-82). Likewise, on September 21, 2007, Plaintiff reported no new seizure, but complained of occasional shaking of the right hand.(Tr. at 266, 280).

Plaintiff had an episode on October 12, 2007, while at Culver Medical with Dr. Ashley. (Tr. at 278). During the visit, Plaintiff reported being nauseated and smelling a foul odor. Id. She cried, reported being frightened, and stared off into space for 15-20 seconds. Id. Dr. Ashley noted that there were no convulsions and the episode was induced by questions about Plaintiff's mood, the shooting, and the killing of her cousin. Id. Dr. Ashley assessed Plaintiff's symptoms as likely migraine headache with some psychological overlay, that might be seizure-related. Id. He recommended APAP, ibuprofen, and caffeine. Id. Plaintiff did not report any seizure activities in subsequent visits to Culver

Medical on October 19, November 7, November 16, and December 12. (Tr. at 257-63, 271-77).

On February 6, 2008, Dr. James Naughten conducted a physical consultative examination. (Tr. at 381-84). During this examination, Plaintiff reported having seizure once every three months, with the last one occurring in July. Id. She did not know which type. Id. Dr. Naughten noted a history of seizure disorder, not otherwise specified. (Tr. at 384).

On April 2, 2008, Culver Medical's Dr. Nead noted that there were no recurrent seizure episodes and opined that Plaintiffs's seizure episodes were "well controlled on current regimen." (Tr. at 480-81). On April 11, Plaintiff reported a seizure episode. (Tr. at 478). Dr. Nead assessed that Plaintiff periodically but rarely has break through events which tended to occur during times of emotional stress. Id. She further opined that it was unlikely that the event represented a change in Plaintiff's seizure disorder and "no adjustment [was] warranted at that time. Id. Plaintiff did not report any seizure symptoms during her next visit to Culver Medical on May 7. (Tr. 476-77).

On June 13, 2008, Plaintiff reported to Culver Medical that she went to Rochester General with complaints of seizure symptoms but was not admitted. (Tr. at 471). Plaintiff also reported seeing her neurologist, and was prescribed Tegretol along with her Dilantin regimen. Id. Culver Medical's Dr. Ashley noted that it

was not clear whether Plaintiff's episodes had an organic etiology. He further noted that the events occurred when Plaintiff had marked changes in psychological comoridities, and questioned whether they were related to Plaintiff's mental status.(Tr. at 472). Plaintiff did not report any seizure symptoms during her subsequent visits on August 15 and September 24. (Tr. at 469, 467).

On January 2, 2009, Plaintiff reported to Culver Medical that she was taken to Rochester General after having a headache and shaking. (Tr. at 465). Dr. Todd Bingemann at Culver Medical assessed the episode as likely non-organic, noting that it was very similar to the other episodes which were induced by emotional stress. (Tr. at 465-69).

Plaintiff was referred to Dr. Jessica Robb, a neurologist, on February 19, 2009. (Tr. at 418-19). Dr. Robb opined that while Plaintiff's symptoms might be caused by generalized seizures, Plaintiff's EEG was normal, MRI of the brain did not reveal any focal intercranial abnormality, and no seizures were witnessed by medical personnel. Id. She noted that Plaintiff reported having episodes despite being on two anti-seizure medications. (Tr. at 419). She concluded that the episodes could be compliance related since Plaintiff missed approximately nine doses of medication weekly. (Tr. at 418-19).

In addition to her seizure disorder, Plaintiff also alleges lumbar spine disorder. A CT of Plaintiff's lumbar spine on

10

March 12, 2007, indicated a metallic density suggestive of a bullet within the L2 vertebra.(Tr. at 294). While there was some surrounding scelorosis along with osteophyte formations, the bullet was away from the spinal canal. (Tr. at 294-297).

 Plaintiff complained of back pain during some of her visits to Culver Medical. She made these complaints on October 18, 2006, July 25, 2007, September 21, 2007, April 2, 2008, June 4, 2008, August 15, 2008. ( Tr. at 266-68, 280-82, 302, 319, 469-70, 473, 480). However, Plaintiff did not complain of back pain in the majority of her visits during the relevant period and Plaintiff's complaints on June 4, 2008 were caused, in part, by being thrown to the ground by a police officer after she tried to intervene in an altercation involving her niece. (Tr. at 473). Culver Medical reported abnormal findings as follows: difficulties with gait on April 2, 2008 and October 18, 2006 and tenderness on October 18, 2006 and August 15, 2008 (Tr. at 302, 319, 469 and 480). Culver Medical recommended conservative treatment with ice and heat and non-steroidal anti-inflammatory drugs (NSAIDs)on August 15, 2008 and June 4, 2008, respectively. (Tr. at 469, 474).

 Plaintiff was evaluated by Dr. James Naughten, a physical consultative examiner on February 6, 2008. (Tr. at 381-84). He noted that Plaintiff had a stiff gait with moderate limp of the right leg, appeared unbalanced walking on heels and toes, and bent her LS spine, hips and knees to 70 degrees when squatting. (Tr. at

382). A musculoskeletal examination indicated the following: limited range of motion of the lumbar spine, in the hip, and straight leg raise; bilateral lumbar pain and spasm; spinal and para-spinal tenderness on palpation; and strength of all extremities was 4/5 proximally and distally. (Tr. at 383). All other findings for Plaintiff's musculoskeletal examination were normal. See Id. Plaintiff's neurological examination was also normal, except for sensitivity to touch and pain in the right thigh. (Tr. at 383). Dr. Naughten opined that Plaintiff had no limitations for sitting, standing, pushing, pulling or reaching; had moderate limitations for walking and climbing stairs; and should be able to lift, carry, and handle objects of a mild degree of weight on an intermittent basis. (Tr. at 384).

Dr. Robb, a neurologist, examined Plaintiff on February 19, 2009. (Tr. at 418-19). The examination indicated normal motor, sensation, coordination, and gait findings. (Tr. at 419).

In addition to her physical impairments, Plaintiff also alleges mental impairments. On October 19, 2007, the Plaintiff was diagnosed with acute post traumatic stress disorder (PTSD) and depression by Dr. Bingemann at Culver Medical. (Tr. at 262). Dr. Nead subsequently prescribed Fluoxentine and Klonazepam on December 12, 2007. (Tr. at 257, 271).

In a letter to the Department of Social Services dated January 8, 2008, Dr. Nead of Culver Medical, requested that Plaintiff be

excused from work for six weeks because of the killing of her cousin. (Tr. at 483.) By May 7, 2008, she was feeling better and reported that she started getting out of the house more. (Tr. at 476). Dr. Ashley noted that Plaintiff had improved markedly since her last visit. Id. On June 13, 2008, Plaintiff reported that her mood symptoms had improved and she was considering returning to work. (Tr. at 471). Dr. Ashley assessed Plaintiff's mood as greatly improved, and noted that her grooming and affect had improved accordingly. (Tr. at 472).

Plaintiff was also evaluated by Nancy Coughlin, LCSW, and Kashinath Patil, a psychiatrist, at Rochester Mental Health Center ("Rochester Mental Health"). On November 26, 2007, Ms. Coughlin noted that Plaintiff enjoys reading, doing crossword puzzles, spending time outside and going out to eat. (Tr. at 366). She also noted that Plaintiff was very close with her family and uses prayer for support, but was distrustful of friends. Id. Ms. Coughlin diagnosed Plaintiff with PTSD and major depressive disorder. (Tr. at 367). Plaintiff's mental status examination revealed normal findings in all categories. (Tr. at 369). Ms. Coughlin scheduled a psychological evaluation with Dr. Patil and assesed Plaintiff's prognosis as good if she followed through with treatment. (Tr. at 369, 367).

Plaintiff continued seeing Ms. Coughlin throughout the relevant period. Mental status examinations revealed that Plaintiff

had suicidal ideation on two occasions, April 22 and June 23 of 2008 (Tr. at 449, 452). She had depressed mood on June 23 and September 5 of 2008 and January 13 and January 20 of 2009. (Tr. at 446, 443, 444, 449). She had fair insight and judgment on September 5, 2008, and January 20, 2009. (Tr. at 446, 440). Additionally, Plaintiff had fair concentration on January 13, 2009 and negative ruminations on January 20, 2009. (Tr. at 443, 444). Except for these reports, Plaintiff's mental status examinations were consistently normal. Plaintiff's last evaluation by Ms. Coughlin, on April 9, 2009, revealed a normal mental status examination in all categories. (Tr. at 439).

In a letter to Plaintiff's attorney dated July 1, 2008, Ms. Coughlin stated that Plaintiff is always neatly dressed and well groomed for her appointments. (Tr. at 416). However, she noted that Plaintiff had missed at least five appointments. Id. Plaintiff reported memory problems, and not having the energy or strength to perform necessary tasks because of being depressed. Id. She however noted that her boyfriend monitors her medication regimen. Id. Plaintiff reported that she is reluctant to go out because she fears she will have a seizure and is also reluctant to make friends. Id. Ms. Coughlin assessed that Plaintiff's isolation and lack of trust is connected to the deaths of her fiancé and cousin. Id. Plaintiff also reported lack of concentration, she "do[es] ok" with short instructions but tends to forget longer instructions.

Id. Plaintiff also reported feeling angry and anxious, and having a low tolerance for noise and stupidity. Id.

On February 9, 2009, Ms. Coughlin diagnosed Plaintiff with PTSD, dysthymic disorder, and a global assessment functioning ("GAF") of 60. (Tr. at 442). Ms. Coughlin noted that Plaintiff had an inconsistent treatment attendance and was "stuck in progress until a shift two weeks ago," when Plaintiff started "leaving the house, going shopping, preparing meals, and feeling motivated to return to college." Id. Ms. Coughlin assessed Plaintiff's prognosis as good, given the recent shift and family support. Id.

Plaintiff saw Dr. Patil throughout 2008. On January 17, 2008, Dr. Patil diagnosed Plaintiff with PTSD, and prescribed Buspar in addition to Prozac. (Tr. at 458). Plaintiff, however, stopped taking Prozac before her next visit with Dr. Patil.(Tr. at 455). During her March 27, 2008 visit, Plaintiff reported having anxiety attacks. Id. However, Dr. Patil observed that Plaintiff was fairly calm, quite coherent and did not have anxiety, depressive, or psychotic symptoms throughout the visit. Id. Because Plaintiff reported that she was unable to tolerate the combination of Prozac and Buspar, Dr. Patil switched Plaintiff to Klonopin and Effexor. (Tr. at 455). On April 24, 2008, Plaintiff reported feeling more relaxed and was no longer having anxiety attacks. (Tr. at 451). However, Plaintiff continued reporting symptoms, and Dr. Patil

increased her Lexapro dose and encouraged her to take Klonopin as directed during her last visit. (Tr. at 447).

On February 6, 2008, Dr. Christine Ransom conducted a psychiatric consultative examination. (Tr. at 377-80). Dr. Ransom noted that Plaintiff has a history of marijuana abuse from 1992 through 2006, and was convicted of possession of a controlled substance in 1990. (Tr. at 378). Except for Plaintiff's speech and affect being moderately dysphoric, irritable, and tense, her mental status examination indicated normal findings. (Tr at 378-79). Dr. Ransom diagnosed Plaintiff with moderate major depressive disorder, moderate to marked PTSD, moderate panic disorder with agoraphobia, and marijuana dependence, currently in remission. (Tr. at 380).

Dr. Ransom opined that Plaintiff can follow and understand simple directions and instructions, perform simple tasks independently, maintain a simple regular schedule, and learn simple new tasks. (Tr. at 379). She further opined that Plaintiff will have moderate to marked difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress because of her PTSD. The results of the evaluation, she noted, were consistent with Plaintiff's allegations. (Tr. at 379-80).

Plaintiff was also evaluated by a state agency psychologist, Dr. Hochberg, on March 10, 2008. (Tr. at 385-98). Dr. Hochberg

assessed mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. (Tr. at 395). Dr. Hochberg noted that Plaintiff's diagnosis of panic disorder with agoraphobia by Dr. Ransom did not seem to be well supported by the objective and corroborated findings, and Plaintiff's treating sources had not given this diagnosis. Id. Dr. Hochberg concluded that Plaintiff has a severe mental impairment that causes limitations. (Tr. at 407). However, her alleged degree of the limitations is not supported by medical evidence, and she can perform a job with simple tasks. Id.

Plaintiff testified that she suffered from a seizure disorder, back problems and anxiety and depression. (Tr. at 28, 34-38). She testified that the seizure disorder was her most serious impairment and she took Dilantin, Tegretol and folic acid, but the record indicates that she was not always compliant with her medication. (Tr. 33). Plaintiff's mother also testified at the hearing and stated that Plaintiff had experienced four or five serious seizures, but she could not recall if the last seizure took place in 2006 or 2007. (Tr. 46-50).

Plaintiff testified that she had debilitating back pain and that she could only sit and stand for a few minutes at a time. (Tr. at 18). Plaintiff also testified that she had anxiety and depression and that she was uncomfortable outside. (Tr. at 20).

17

She testified that she does crossword puzzles and spends time with her niece who helps her with household chores. (Tr. at 39).

B. There is Substantial Evidence in the Record to Support the ALJ's Disability Determination

Plaintiff argues that the ALJ improperly dismissed the opinions of her treating physicians and that the ALJ improperly determined that her subjective complaints were not credible. This Court finds that the ALJ properly considered the opinions of Plaintiff's treating physicians and the Plaintiff's testimony, and that there is substantial evidence in the record to support the ALJ's disability determination.

The opinion of a treating physician is controlling if it is well supported by medically acceptable clinical and diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); See Schisler v. Heckler, 787 F.2d 76, 81 (2d Cir. 1986). This is because a treating physician generally has observed the patient over a long period of time and can give a detailed medical history. Salisbury v. Astrue, 06-CV-6629L, 2008 U.S. Dist. LEXIS 97618 * 10 (W.D.N.Y. Dec. 2, 2008). When deciding whether to give a treating physician controlling weight, the ALJ must consider (1) whether a treatment relationship exists; (2) the length and nature of the treatment relationship; (3) the support for the opinion from medical and laboratory findings; (4) the consistency with the record as a whole; (5) specialization of the treating physician; and (6) other

evidence that supports or contradicts the opinion. Id. The ALJ must also provide an explanation supporting his determination. § 404.1527(d)(2).

Here, the ALJ noted that none of Plaintiff's treating physicians reported that she was unable to engage in substantial gainful activities for a period longer than six weeks. (Tr. at 15). The ALJ considered the opinion of Plaintiff's treating physician, Dr. Nead, who opined in 2008 that Plaintiff could not work for six weeks after her cousin was killed, and gave it "some weight," but he noted that Dr. Nead's "opinion does not come close to finding a disability lasting for one year as required under the regulations." (Tr. at 14). Additionally, although Ms. Coughlin, Plaintiff's licensed clinical social worker, is not an acceptable medical source for the treating source preference, the ALJ, nevertheless, gave great weight to her opinion that Plaintiff was unable to engage in complex tasks, and was distrustful of others. Id. The ALJ also gave weight to the opinions of consultative examiners, Dr. James Naughten and Christine Ransom ,because they were consistent with the objective medical evidence and other evidence in the record that Plaintiff could perform light work. Id.

There are conflicting reports regarding the frequency of Plaintiff's seizures. While Plaintiff was diagnosed with a seizure disorder, she reported that she stopped working in 2006 because she was laid off from work. (Tr. at 302). Neurological evaluations

indicate that Plaintiff could suffer from generalized seizures, but that diagnostic studies were normal. (Tr. at 418-419). The record also indicates that Plaintiff has not consistently taken her seizure medication as instructed. In fact, the record indicates that as of February 2009, Plaintiff missed approximately nine doses of her seizure medication weekly. (Tr. at 418-419). Plaintiff's treating physicians had toxicity concerns regarding her seizure medication, Dilantin, however, Plaintiff's toxicity symptoms were resolved by October 30, 2006. (Tr. at 300, 302).

With respect to Plaintiff's mental impairments, the ALJ noted that Plaintiff understandably experienced PTSD after witnessing the killing of her fiancé, which was exacerbated by the killing of her cousin. In 2008, Dr. Nead wrote a letter to the Department of Social Services requesting that Plaintiff be excused from work for six weeks because of the killing of her cousin. (Tr. at 472). However, Plaintiff later reported that her mood and symptoms had improved and she was considering returning to work. (Tr. at 476). The record also indicates that Plaintiff had a history of inconsistent attendance for her mental health appointments. (Tr. at 442). Nevertheless, by February 2009, Plaintiff reported that she was feeling better and had started "leaving the house, going shopping, preparing meals, and feeling motivated to return to college. Id. This improvement is corroborated by Plaintiff's subsequent mental status examinations in February, March, and April

of 2009, which all had normal findings in all categories. (Tr. at 439-441).

Plaintiff complained of back pain occasionally and diagnostic tests indicate a metallic density suggestive of a bullet in her spine. (Tr. at 294). Physical examinations by her treating physicians revealed tenderness and difficulty with gait on two occasions. (Tr. at 480, 302, 469, 319). Plaintiff's treating physicians recommended conservative treatment with ice and heat and anti-inflammatory drugs.( tr. at 469, 474). This Court finds that Plaintiff's allegations of debilitating back pain are not consistent with the medical evidence in the record, which indicates that she was treated conservatively for intermittent back pain.

Further, there is substantial evidence in the record to support the ALJ's finding that the Plaintiff's subjective complaints and alleged limitations were not credible. Plaintiff reported that she experienced debilitating back pain, but the medical evidence does not support Plaintiff's allegations. Plaintiff only occasionally complained to her doctors of back pain during the relevant period and she was being treated conservatively for the alleged impairment. With respect to Plaintiff's seizure disorder, the record indicates that Plaintiff was often non-compliant with treatment and that her treating physician's did not recommend that she discontinue working because of this impairment.

Further, Plaintiff's treating sources indicated that her mental impairments were improving.

Plaintiff also argues that the ALJ was obligated to contact Plaintiff's physicians for more information because, in the Plaintiff's view, there was insufficient evidence for the ALJ to make a disability determination. This Court disagrees. While it is the duty of the ALJ to seek to fill in gaps in the administrative record before making a disability determination (see Rose v. Callahan, 168 F.2d 72, 79 (2d Cir. 2005)), Plaintiff has not pointed to any information that the ALJ failed to consider. Further, this Court finds that the ALJ properly considered all of the medical and other evidence in the record in making his determination and that the Plaintiff was not disabled and that there is substantial evidence in the record to support this decision.

Because this Court finds that there is substantial evidence in the record to support the ALJ's decision that the Plaintiff was not disabled within the meaning of the Act, this Court grants the Commission's motion for judgment on the pleadings. Plaintiff's motion for judgment on the pleadings is denied and Plaintiff's Complaint is hereby dismissed.

## CONCLUSION

For the reasons set forth above, the court hereby grants judgment on the pleadings in favor of the Commissioner. The Plaintiff's motion for judgment on the pleadings is denied.

ALL OF THE ABOVE IS SO ORDERED.

s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           February 3, 2011